**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LEXINGTON INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-1741 |
| | § | |
| CHICAGO INSURANCE COMPANY, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This case is at bottom a coverage dispute between two insurers, Chicago Insurance Company and Lexington Insurance Company.  These insurers issued consecutive primary professional liability policies to a health care agency, Staff Search Ltd.  Both insurers paid to defend Staff Search and an employee sued in a medical malpractice lawsuit.  Each insurer contributed half the amount needed to settle the claims against the insureds in that lawsuit. Staff Search was fully released in the settlement and either no longer exists or is no longer in business.  The issue raised in this case is whether Lexington may obtain reimbursement from the other insurer, Chicago, on the ground that the Lexington policy did not in fact cover the underlying lawsuit.

Based on the pleadings, the motions, the record, the arguments of counsel, and the applicable law, this court denies Lexington's motion seeking summary judgment that as a matter of law the Lexington policy did not cover the underlying lawsuit.  Because

Lexington's grounds for asserting that its policy did not cover the claim are denied, under the Texas Supreme Court's decision in *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.*, 236 S.W.3d 765 (Tex. 2007), as an insurer of a covered lawsuit against its insured, Lexington cannot obtain reimbursement from a coinsurer for the amount contributed to settle that lawsuit and fully release the insured.  The reasons for this result are explained in detail below.

## I.      Procedural and Factual Background

### A.      The Pending Motions

Chicago issued a primary professional liability policy to Staff Search for 2003 to 2004; Lexington issued a policy for 2005 to 2006.  Lexington tendered a defense in the underlying lawsuit to Staff Search and its employee, Patricia Meadows, subject to a reservation of rights.  In this case, Lexington sued Staff Search and Meadows seeking a declaratory judgment that it owed no duty to defend or indemnify because the policy should be reformed to exclude coverage for the underlying suit or because as written the policy did not provide coverage.  Lexington also sued Chicago, seeking contractual subrogation for the defense costs Lexington had paid before tendering the defense to Chicago.

Lexington and Chicago eventually agreed to settle the underlying suit with each paying half of the settlement amount, subject to a nonwaiver agreement that preserved any rights they had to challenge coverage and to seek reimbursement from the other of the amount paid to "temporarily fund" the settlement.   In this suit, Lexington seeks reimbursement from Chicago for the amount paid to defend and then settle the claims against

Staff Search and Meadows in the underlying suit.  Lexington asserts that its policy provided no coverage for the insured's liability in the underlying suit.  Chicago counterclaimed against Lexington, seeking a declaratory judgment that it had no obligation to defend or indemnify Staff Search or Meadows in the underlying suit and that it has no obligation to reimburse Lexington for the defense costs or settlement.  Staff Search and Meadows filed a third-party action against Chicago, seeking a declaratory judgment that Chicago owed both a duty to defend and to indemnify in the underlying suit and in a different suit and that Chicago had breached its contractual obligations.

The following motions are pending:

1.   Lexington has moved for partial summary judgment against Staff Search and Meadows, seeking reformation of the Lexington policy issued to Staff Search. (Docket Entry No. 47).  Staff Search and Meadows have responded, (Docket Entry No. 53), and Lexington has replied, (Docket Entry No. 57).  Lexington has also objected to an affidavit that Staff Search and Meadows attached to their summary judgment response.  (Docket Entry No. 58).

2.   Lexington has moved for summary judgment that Chicago, not Lexington, owed Staff Search and Meadows both a duty to defend and to indemnify and that Chicago must reimburse Lexington for the money it paid to settle the underlying lawsuit against the insureds and the defense costs it incurred after the defense was tendered to Chicago.  (Docket Entry No. 48).  Chicago has responded, (Docket Entry No. 54).  Lexington has replied, (Docket Entry No.

3

59), and supplemented its summary judgment motion, (Docket Entry No. 68). Lexington has also objected to an affidavit that Chicago attached to its summary judgment response.  (Docket Entry No. 60).

3.    Chicago has moved for summary judgment against Lexington, asserting that Chicago is not required to reimburse any amounts Lexington paid to settle the underlying lawsuit on behalf of the insureds.   (Docket Entry No. 61). Lexington has responded, (Docket Entry No. 62), and Chicago has replied, (Docket Entry No. 63).  Chicago has also supplemented its summary judgment motion.  (Docket Entry No. 67).

This court: denies Lexington's summary judgment motion against Staff Search and Meadows because the record does not permit this court to hold that as a matter of law the policy should be reformed because of mutual mistake; denies Lexington's summary judgment motion against Chicago because the record does not permit a determination that, as a matter of law, Lexington's policy did not cover the underlying lawsuit; and grants Chicago's summary judgment motion against Lexington because as a matter of law, Lexington has no claim for contribution or subrogation against Chicago.

B.    The Insurance Policies

Chicago, Interstate Fire & Casualty Company, and Lexington each issued primary professional liability policies to the insured, Staff Search Ltd.  The Chicago policy issued on May 29, 2003 and had effective dates from April 17, 2003 to April 17, 2004; the Interstate policy had effective dates from April 17, 2004 to April 17, 2005, and the Lexington policy

4

issued on May 10, 2005 and had effective dates from April 17, 2005 to April 17, 2006.  The

parties agree that the two policies at issue are the 2003–2004 Chicago policy and the

2005–2006 Lexington policy.

I.      *The Chicago Policy*

Chicago issued Staff Search a "Specified Medical Professional Liability Occurrence

Insurance Policy" with a policy period from April 17, 2003 to April 17, 2004.  Both Staff

Search and Meadows are insureds under this occurrence-based policy covering medical

professional liability, with a liability limit of $1 million per incident.  (Docket Entry No. 1

at 3; Docket Entry 48, Ex. 4).[1]  The policy stated as follows:

> [T]he Company will pay on behalf of the Insured all sums which
> the Insured shall become legally obligated to pay as Damages
> because of Bodily Injury, Property Damage, Personal Injury to
> which this insurance applies in the operation of the business or
> conduct of the profession of the Named Insured as specified on
> the Declarations page, caused by an Incident which occurs
> during the Policy Period.

(Docket Entry No. 48, Ex. 4).  The policy also contains an "Other Insurance" clause, which

states:

> If there is other valid insurance (whether primary, excess,
> contingent or self-insurance) which may apply against a loss or
> claim covered by this policy, the insurance provided hereunder
> shall be deemed excess insurance over and above the applicable
> limit of all other insurance or self-insurance.

(*Id.*, Ex. 4).  This Chicago policy required Staff Search to notify Chicago "as soon as

---

[1]  During the same period, Staff Search was insured for nonmedical staffing errors and omissions
under a claims-made policy issued by Evanston Insurance Company.  (Docket Entry No. 47 at 4).

practicable of any claim made against [Staff Search] or of any specific circumstances involving a particular person likely to result in a claim." (*Id.*, Ex. 4).

>    2.    *The Lexington Policy*

Lexington issued Staff Search a "Health Care Agency Professional Liability Policy" with a policy period from April 17, 2005 to April 17, 2006. Meadows was also an insured under this policy, which had a liability limit of $1 million for each wrongful act or series of continuous or related acts. (Docket Entry No. 1 at 3; Docket Entry No. 47, Ex. 2-C).

The policy's Declarations page stated that it is a claims-made policy covering medical professional liability with a policy period from April 17, 2005 to April 17, 2006 and a retroactive date of April 17, 2001. The policy states as follows:

>    WHAT THIS AGREEMENT COVERS
>
>    Professional Liability
>
>    We'll pay amounts you are legally required to pay to compensate others for loss resulting from your wrongful act or that of another for whom you are legally responsible. The wrongful act must be solely in the conduct of your business as a health care agency and must take place on or after the retroactive date and before the end of the policy period. A claim[] for such wrongful act must be first made against you during the policy period, and we or our authorized agent also must be notified of the claim in writing during the policy period.

(Docket Entry No. 47, Ex. 2-C).

The Lexington policy included an "Other Insurance" provision, which stated as follows:

>    Other Insurance

> A loss covered under the policy may also be covered under another policy you have.  If it is, our policy will apply only in excess of such other coverage no matter how such other coverage is described.  This clause will not apply to coverage which is expressly stated to apply in excess of this specific policy.

(Docket Entry No. 47, Ex. 2-C).  In addition, the Lexington policy excluded coverage for "any wrongful act covered under any policy in effect before this policy."  (*Id.*, Ex. 2-C).

In its motion for partial summary judgment against Staff Search and Meadows, Lexington seeks to reform the policy on the basis of mutual mistake.  Lexington acknowledges a series of drafting errors that it committed that it asserts expanded its coverage obligation beyond what it and its insured intended.  Lexington asserts that through a series of badly drafted policy endorsements, it expanded the retroactive date for medical professional liability claims by three years and transformed what was intended to remain a claims-made policy into an occurrence policy.  Lexington asserts that as written, the policy does not accurately reflect the parties' intentions.  Lexington asserts that the policy should be reformed to be consistent with the coverage the parties intended to obtain.

Lexington asserts that during the underwriting process, Staff Search sought a claims-made policy that covered both medical professional liability and nonmedical staffing errors and omissions.  Lexington asserts that the parties agreed that to avoid gaps in coverage, the policy would need to have a retroactive date of April 17, 2001 for coverage for nonmedical staffing errors and omissions and a retroactive date of April 17, 2004 for coverage for medical professional liability.  Lexington intended the policy to cover nonmedical staffing

error or omission liabilities based on events that occurred between April 17, 2001 and the end

of the policy period, April 17, 2006, for which Staff Search made a claim between April 17,

2005 and April 17, 2006.  Similarly, Lexington intended to have the policy cover acts giving

rise to medical professional liability if the act occurred between April 17, 2004 and April 17,

2006 and Staff Search made the claim between April 17, 2005 and April 17, 2006.

Lexington asserts that it attempted to effectuate Staff Search's coverage requirements by

drafting two policy endorsements, Endorsement 2 and Endorsement 4.  Lexington argues that

it made critical mistakes in drafting both endorsements that amount to mutual mistake

because Staff Search and Lexington shared a common understanding of the scope of the

policy's coverage.

Lexington asserts that Endorsement 2 "was added to provide a retroactive date of

April 17, 2004 for medical professional liability and a retroactive date of April 17, 2001 for

non-medical staffing errors and omissions."  (Docket Entry No. 47 at 8).  Endorsement 2 has

an effective date of April 17, 2005 and stated as follows:

> In consideration of the premium charged, it is hereby understood
> and agreed that the policy will include a 4/17/01 Retro Date with
> the following exception:
>
> "Claims arising out of the providing or failure to provide
> medical services will have a retro date of 4/17/04 for any
> services that would have been covered under the prior Interstate
> policy #ASC10000U."
>
> All other terms, conditions, and exclusions remain the same.

(*Id.*, Ex. 2-C).  Lexington argues that Endorsement 2 does not accurately reflect the parties'

intentions because the parties did not intend that the April 17, 2004 retroactive date would be limited to claims covered by the prior policy (issued by Interstate), but instead intended the April 17, 2004 retroactive date to apply to *all* professional medical liability claims. Lexington also argues that Endorsement 2 erroneously identifies the prior Interstate policy number as "ASC10000U," instead of "ASC1000011."

Lexington asserts that Endorsement 4 was intended "to expand the scope of coverage to also include non-medical staffing errors and omissions." (Docket Entry No. 47 at 10). Lexington asserts that the parties agreed to Endorsement 4 on May 17, 2005, one month after the Lexington policy period began, because they realized that the policy provided coverage only for professional medical liability and did not cover nonmedical staffing errors and omissions, as intended. Endorsement 4 has an effective date of April 17, 2005 and states as follows:

> In consideration of the premium charged, it is hereby understood and agreed that Section I, WHAT THIS AGREEMENT COVERS, is amended to read as follows:
>
> Professional Liability
>
> We'll pay you amounts you are legally obligated to pay to compensate others for loss resulting from your wrongful act or that of another for whom you are legally responsible. The wrongful act must first take place during the policy period and solely in the conduct of your business as a healthcare agency and or temporary help service agency.
>
> For purposes of this endorsement, temporary help service agency means an agency, supplying for a fee, clerical staff to a client of the agency.

All other terms, conditions, and exclusions remain the same.

(*Id.*, Ex. 2-C).  Lexington argues that Endorsement 4 turned the policy into an occurrence-based policy by requiring the "wrongful act [to] first take place during the policy period," with no requirement as to when the claim had to be made, contrary to what the parties intended.  Lexington argues that the parties did not intend to have an occurrence-based policy, but instead intended to have a claims-made policy with a retroactive date of April 17, 2004 for medical professional liability coverage and a retroactive date of April 17, 2001 for nonmedical staffing errors and omissions coverage.

### C.    The Underlying Lawsuit

On December 21, 2004, Rocky Zucha, individually and as next best friend of his son Caleb Zucha, sued Methodist Health Centers and several other defendants in Texas state court, alleging medical malpractice.  The Zuchas amended their complaint to name Staff Search and one of its employees, Patricia Meadows, as defendants on May 5, 2005.  The Zuchas asserted malpractice claims based on medical services that Meadows had provided Caleb Zucha as a Staff Search employee on January 7, 2004.  On July 7, 2005, Staff Search notified Lexington of the *Zucha* lawsuit.  Lexington agreed to defend Staff Search and Meadows subject to a reservation of rights.  Lexington hired defense counsel on behalf of Staff Search and Meadows and paid the defense costs for these insureds in the underlying lawsuit.

Approximately eight months later, on March 31, 2006, Lexington sent a letter to Staff Search and Meadows stating that the acts alleged in the underlying lawsuit had occurred

during a period covered by an earlier insurance policy and that Lexington had concluded that
it had no duty to defend or indemnify.  (Docket Entry No. 48, Ex. 2).  Lexington asked Staff
Search and Meadows to notify the insurers that had issued the earlier policies, Interstate and
Chicago, about the underlying lawsuit.  Staff Search and Meadows did so.  Chicago and
Interstate took the position that their policies afforded no coverage and that Staff Search and
Meadows had failed to provide timely notice of the claims asserted in the underlying suit.

Mediation in the underlying lawsuit occurred on April 5, 2006.  Because of the
coverage dispute between Lexington and Chicago, Staff Search and Meadows were the only
parties to the underlying lawsuit that did not settle at the mediation.  (Docket Entry No. 54
at 4).

After the mediation, Chicago participated in defending Staff Search and Meadows
subject to a reservation of rights.  A second mediation took place on October 16, 2007.
Lexington and Chicago settled the underlying lawsuit on behalf of Staff Search and
Meadows, fully releasing the insureds, who paid nothing toward the settlement.  Lexington
and Chicago each paid fifty percent of the settlement amount.  The two insurers entered into
a "nonwaiver agreement," which states as follows:

> 3.06 Each Party acknowledges that the other Party to this
> Agreement does not concede coverage under its respective
> Policy and that each Party contends that other Parties should
> fund the entire amount of any settlement of the Underlying
> Lawsuit that might be negotiated.  By agreeing to share in the
> temporary funding of any settlement that might be negotiated,
> the Parties do not waive, and expressly reserve, any and all of
> the terms, conditions, exclusions, and other provisions of their
> respective Policies, as well as any defense under applicable law.

> Each Party specifically reserves the right to seek reimbursement from any other Party of any amount advanced to temporarily fund any settlement.

(Docket Entry No. 62, Ex. 9).

### D.    The Pending Motions

In this case, Lexington moves for partial summary judgment against Staff Search and Meadows, seeking reformation of the Lexington policy on the basis of mutual mistake. Lexington argues that the policy as written does not accurately reflect the parties' intentions as to the policy's retroactive date for medical professional liability claims and as to whether the policy would provide claims-made or occurrence-based coverage for such claims. Staff Search argues that Lexington has failed to show a mutual as opposed to a unilateral mistake. Staff Search asserts that it intended to obtain the most coverage for the least cost possible, which is what the policy as written provided.

Lexington also moves for summary judgment against Chicago, arguing that the Lexington policy provides no coverage for the underlying lawsuit. Lexington asserts different grounds for this result, one ground urging reformation of the policy and the other grounds based on enforcing other parts of the policy as written. Lexington asserts that either reforming the policy or enforcing it as written provides a basis for obtaining reimbursement from Chicago for the amounts Lexington paid to defend its insureds and to fund half the settlement of the underlying suit.

Chicago cross-moves for summary judgment against Lexington, arguing that Lexington has no right to be reimbursed for half the settlement amount or for the amount it

12

paid to defend its insureds after they gave notice of the suit to Chicago. Chicago argues that Lexington has no viable claim for subrogation or contribution against Chicago under *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.*, 236 S.W.3d 765 (Tex. 2007). Chicago also argues that Lexington is estopped from asserting a reformation claim.

The parties agree that if *Mid-Continent* precludes Lexington's claims against Chicago, this court need not resolve Lexington's claim to reform the policy to address speculative future claims by its insureds. Accordingly, the first issue addressed is whether the Texas Supreme Court's decision in *Mid-Continent* precludes Lexington's claim that it is entitled to reimbursement for the amounts it spent to settle the underlying lawsuit and to defend its insureds after Chicago had been tendered the defense.

## II.   The Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently

supports an essential element or claim. *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. ExxonMobil Corp*., 155 Fed. Appx. 798, 800 (5th Cir. 2005).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800.

### B.     Contract Interpretation Under Texas Law

In interpreting an insurance policy, a court applies the same rules for interpreting other

types of contracts, reading all parts of the policy together and exercising caution not to isolate particular sections or provisions from the contract as a whole. *Provident Life & Accident Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (citations omitted).  Viewing the policy in its entirety allows the court to give effect to the written expression of the parties' intent. *Id.* (citing *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999)).  If the insurer relies on an exclusion to the policy, it bears the burden of proof to show that the exclusion is applicable. *Crocker v. Am. Nat'l Gen. Ins. Co.*, 211 S.W.3d 928, 931 (Tex. App.—Dallas 2007, no pet.).  A court may construe an unambiguous policy as a matter of law. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006).  If a policy provision has more than one reasonable interpretation, it is ambiguous and must be construed in favor of the insured if a favorable construction is not unreasonable. *Id.*  In interpreting the policy, a court must read all parts of the policy together, giving meaning to each sentence, clause, and word, in order to avoid rendering any portion inoperative. *Id.* at 748.  The parties' intent "is governed by what they said, not by what they *intended* to say but did not." *Id.* at 746.

## III.   Analysis

Lexington seeks to recover from Chicago both the amount Lexington paid to settle the underlying lawsuit – fifty percent of the total settlement pot for Staff Search and Meadows – and the amount Lexington paid to defend that lawsuit after tendering the defense to Chicago on March 31, 2006.  Lexington argues that the Chicago policy covers the underlying lawsuit and the Lexington policy does not, either as reformed or as written.  Lexington contends that the parties' nonwaiver agreement allows Lexington to assert the absence of

coverage to obtain reimbursement of its settlement contribution and the defense costs it incurred after tendering the defense of the underlying lawsuit to Chicago.

Chicago responds that Lexington has failed to show any right to reimbursement. Chicago argues that in *Mid-Continent*, "the Texas Supreme Court rejected any claim for contribution and subrogation between settling co-insurers." (Docket Entry No. 67 at 1). Chicago also argues that its policy does not cover the underlying lawsuit, that the Lexington policy may not be reformed to exclude coverage, and that as written the Lexington policy does cover the underlying suit.

### A.   Does *Mid-Continent* Preclude Lexington's Claim to Reimbursement?

#### 1.   The Parties' Contentions

Chicago argues that Lexington has no right to contribution or subrogation against Chicago as a coinsurer.  As to contribution, Chicago contends that under *Mid-Continent*, when the policies of two coprimary insurers contain "other insurance" or "pro rata" clauses, there is "no equitable right of contribution between the carriers." (*Id.* at 2).  Relying on *Employers Casualty Co. v. Transport Insurance Co.*, 444 S.W.2d 606 (Tex. 1969), Chicago argues that if two policies both provide coverage and contain "other insurance" clauses, the clauses "are deemed mutually repugnant and a pro rata allocation is made" between the insurers (Docket Entry No. 61 at 5).  Because Chicago and Lexington funded the settlement equally and their policies both have $1 million limits and "other insurance" clauses, Chicago contends that Lexington cannot seek contribution to obtain reimbursement of the 50% payment Lexington made to fund the settlement amount.

16

As to subrogation, Chicago asserts that the *Mid-Continent* court held "that a fully indemnified insured has no right to recover an additional pro rata portion of the settlement from an insurer, regardless of that insurer's contribution to the settlement." (Docket Entry No. 61 at 2). Because the insureds were fully indemnified, they have "no contractual rights that a co-insurer may assert against another co-insurer in subrogation." (*Id.* at 2). In addition, Chicago argues that Lexington is estopped from asserting a claim of reformation to avoid coverage for the underlying lawsuit.

Chicago further asserts that its policy does not provide coverage for the underlying lawsuit. Citing *American Teachers Life Insurance Co. v. Brugette*, 728 S.W.2d 763, 764 (Tex. 1987), and related cases, Chicago argues that Staff Search's failure to provide timely notice of the underlying lawsuit "voids policy coverage." (Docket Entry No. 54 at 7).

Lexington responds by distinguishing *Mid-Continent* on its facts. *Mid-Continent* involved two primary coinsurers, both of which had policies that the parties conceded covered the underlying lawsuit. Lexington argues that *Mid-Continent* is inapplicable because neither Chicago nor Lexington concedes coverage. Lexington contends that either as reformed or as written, its policy does not provide coverage for the underlying lawsuit and that, as a result, Chicago and Lexington are not coinsurers; the "other insurance" clauses in the two policies are "irrelevant"; and *Mid-Continent*'s coprimary insurer analysis does not apply. (Docket Entry No. 62 at 8–9).

Lexington argues that if this court reforms its policy to reflect the intent of the contracting parties, that would result in an April 17, 2004 retroactive date for medical

professional liability, which would not cover the underlying lawsuit because the wrongful act occurred on January 7, 2004, before the (reformed) retroactive date. If this court declines to reform Endorsement 4 in this fashion, Lexington argues that enforcing Exclusion o or Endorsement 4 as drafted would lead to no coverage.

Exclusion o states that there is no coverage for wrongful acts "covered under any policy in effect before this policy." (Docket Entry No. 47, Ex. 2-C). Because the Chicago policy period was April 17, 2003 to April 17, 2004 and the Lexington policy period was April 17, 2005 to April 17, 2006, Lexington contends that the Chicago policy was "in effect" before the Lexington policy and that coverage for the underlying lawsuit is excluded under the Lexington policy. Endorsement 4 provides coverage only for wrongful acts that "take place during the policy period." (Docket Entry No. 47, Ex. 2-C). The Lexington policy defines "policy period" as "the period commencing on the effective date shown in the Declarations." The Declarations page states that the effective dates are April 17, 2005 to April 17, 2006. (*Id.*, Ex. 2-C). Lexington acknowledges that the Declarations page also states a retroactive date of April 17, 2001 and that Endorsement 2 provides a retroactive date of April 17, 2001, with the exception of a retroactive date of April 17, 2004 "for any services that would have been covered under the prior Interstate policy #ASC-10000U." (*Id.*, Ex. 2-C). Citing *INA of Texas v. Leonard*, 714 S.W.2d 414, 416 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.), Lexington argues that to the extent its interpretation of Endorsement 4 conflicts with the coverage provided by the retroactive dates specified in the policy's Declarations page and Endorsement 2, Endorsement 4 takes precedence because it was issued

18

last in time.  Lexington argues that because Endorsement 4 limits coverage to liability arising from acts occurring between April 17, 2005 and April 17, 2006, the policy does not cover the underlying lawsuit.    At oral argument, Lexington acknowledged that such an interpretation of Endorsement 4 would be against the insured's (and Lexington's) intent. Lexington admitted that it ineptly and incorrectly drafted Endorsement 4 and that the coverage provided by the Lexington policy was not intended to be limited to acts occurring after April 2005.  Lexington's interpretation of Endorsement 4 as written would eliminate most of the coverage the policy was intended to provide and would make the retroactive date in Endorsement 2, as well as the retroactive date on the policy's Declarations page, meaningless.

Lexington further distinguishes *Mid-Continent* on the ground that the coinsurers in that case had no contractual obligations between them.  In contrast, Lexington argues that the nonwaiver agreement entered when the underlying suit was settled "created a separate contractual right of reimbursement between the insurers."  (Docket Entry No. 68 at 6). Lexington emphasizes that both parties entered into the nonwaiver agreement to allow them to settle the underlying lawsuit while reserving the right to seek reimbursement from the other party.  (Docket Entry No. 62, Ex. 9).  Lexington emphasizes that in the nonwaiver agreement, the parties agreed that "by entering into this Agreement and performing as contemplated, neither of the Parties is acting as a volunteer."  (Docket Entry No. 62, Ex. 9). Chicago responds that when the parties signed the nonwaiver agreement, they knew that *Mid-Continent* was pending before the Texas Supreme Court and they simply reserved whatever

19

rights the court might provide or define when it decided *Mid-Continent.*

       2.    *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.*

In *Mid-Continent*, 236 S.W.3d at 765, the defendant in the underlying lawsuit was a covered insured under two comprehensive general liability policies. The underlying defendant was a named insured under a policy issued by Liberty Mutual and an additional insured under its subcontractor's policy issued by Mid-Continent. Both policies provided the insured $1 million in coverage for the underlying suit. The insurers had no contract between them implicated by the underlying lawsuit. Neither insurer disputed that it owed a duty to defend and to indemnify. The only issue was the relative amount each would be required to pay in the settlement. The issue was not whether coverage existed, but the relative amount each insurer would be required to pay.

During settlement negotiations, the two insurers agreed that a verdict against the defendant insured would be approximately $2 to $3 million but disagreed on the settlement value of the case. Liberty Mutual estimated the settlement value at $1.5 million. Mid-Continent estimated the settlement value at $300,000 and was willing to pay only half this amount in a settlement. Liberty Mutual eventually agreed at mediation to pay $1.5 million to settle the underlying case. Mid-Continent agreed to pay only $150,000 toward the settlement. Liberty Mutual funded the remaining $1.35 million, paying $350,000 more than its $1 million policy limit. Liberty Mutual reserved the right to seek recovery against Mid-Continent for part of the amount it paid to settle.

Liberty Mutual sued Mid-Continent in state court, seeking reimbursement of half the

amount that Liberty Mutual had paid to settle the underlying case.  Mid-Continent timely

removed to federal court based on diversity jurisdiction.  After a bench trial, the district court

ruled in favor of Mid-Continent, finding that Liberty Mutual was entitled to recover

$550,000 from Mid-Continent based on subrogation.  Mid-Continent appealed.  The Fifth

Circuit certified the following questions to the Texas Supreme Court:

> 1. Two insurers, providing the same insured applicable primary
> insurance liability coverage under policies with $1 million limits
> and standard provisions (one insurer also providing the insured
> coverage under a $10 million excess policy), cooperatively
> assume defense of the suit against their common insured,
> admitting coverage.  The insurer also issuing the excess policy
> procures an offer to settle for the reasonable amount of $1.5
> million and demands that the other insurer contribute its
> proportionate part of that settlement, but the other insurer,
> unreasonably valuing the case at no more than $300,000,
> contributes only $150,000, although it could contribute as much
> as $700,000 without exceeding its remaining available policy
> limits.  As a result, the case settles (without an actual trial) for
> $1.5 million funded $1.35 million by the insurer which also
> issued the excess policy and $150,000 by the other insurer.
>
> In that situation is any actionable duty owed (directly or by
> subrogation to the insured's rights) to the insurer paying the
> $1.35 million by the underpaying insurer to reimburse the
> former respecting its payment of more than its proportionate part
> of the settlement?
>
> 2. If there is potentially such a duty, does it depend on the
> underpaying insurer having been negligent in its ultimate
> evaluation of the case as worth no more than $300,000, or does
> the duty depend on the underpaying insured's evaluation having
> been sufficiently wrongful to justify an action for breach of the
> duty of good faith and fair dealing for denial of a first party
> claim, or is the existence of the duty measured by some other
> standard?

> 3. If there is potentially such a duty, is it limited to a duty owed the overpaying insurer respecting the $350,000 it paid on the settlement under its excess policy?

*Liberty Mut. Ins. Co. v. Mid-Continent Ins. Co.*, 405 F.3d 296, 310 (5th Cir. 2005).

The Texas Supreme Court examined whether Liberty Mutual could assert a right of contribution or subrogation against Mid-Continent to recover the amount that Liberty Mutual asserted exceeded its proportionate share of the settlement. The court noted that although both insurers had "pro rata" clauses in their policies, under which they agreed to pay a proportionate share of the insured's loss up to $1 million, they did not "contract with each other to create obligations between themselves or to pay each other's proportionate share of [the insured's] loss." 236 S.W.3d at 773. Citing *Traders & General Insurance Co. v. Hicks Rubber Co.*, 169 S.W.2d 142, 148 (1943), the court reaffirmed the principle that "a direct claim for contribution between co-insurers disappears when the insurance policies contain 'other insurance' or 'pro rata' clauses." *Id.* at 772. The court explained:

> A pro rata clause operates to ensure that each insurer is not liable for any greater proportion of the loss than the coverage amount in its policy bears to the entire amount of insurance coverage available. The effect of the pro rata clause precludes a direct claim for contribution among insurers because the clause makes the contracts several and independent of each other. With independent contractual obligations, the co-insurers do not meet the common obligation requirement of a contribution claim—each co-insurer contractually agreed with the insured to pay only its pro rata share of a covered loss; the co-insurers did not contractually agree to pay each other's pro rata share.

*Id.* (internal citations omitted). Because the pro rata clauses in the insurers' policies

22

precluded a direct claim for contribution between them, and because the insurers did not contract with each other to "create obligations between themselves or to pay each other's proportionate share" of the settlement amount, the court concluded that Liberty Mutual had no right of contribution against Mid-Continent. *Id.* at 773. Even if Liberty Mutual had paid "more than its contractually agreed upon proportionate share," it did so "voluntarily; that is, without a legal obligation to do so." *Id.* at 772. "Thus, a co-insurer paying more than its proportionate share cannot recover the excess from the other co-insurers." *Id.* (citing *Hicks Rubber*, 169 S.W.2d at 148).

The court also concluded that Liberty Mutual had right to contractual or equitable subrogation against Mid-Continent. In asserting a claim for subrogation, "the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." 236 S.W.3d at 774 (citations omitted). The *Mid-Continent* court found that Liberty Mutual had no claim of contractual subrogation because the insured had been fully indemnified and therefore had "no right . . . to enforce Mid-Continent's duty to pay its pro rata share of the loss." *Id.* at 775. Otherwise the insured would have a right to double recovery. *See id.* The court also found that Liberty Mutual had no claim of equitable subrogation against Mid-Continent:

> Equity does not demand a different result here. We hold, therefore, that a fully indemnified insured has no right to recover an additional pro rata portion of the settlement from an insurer regardless of that insurer's contribution to the settlement. Having fully recovered its loss, an insured has no contractual rights that a co-insurer may assert against another co-insurer in subrogation.

*Id.* at 775–76.

Since *Mid-Continent*, few courts have addressed what claims insurers who jointly assume the duty to defend or the duty to indemnify may assert against each other if the underlying case is settled.  *See Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, No. H-07-0878, 2008 WL 2078202 (S.D. Tex. May 15, 2008) (holding that coinsurers whose policies contain applicable pro rata clauses have no right to contribution or subrogation under *Mid-Continent*).  The primary guidance is provided by *Mid-Continent* itself.

### C.     The Issues under *Mid-Continent*

There are significant differences between the positions the parties took in *Mid-Continent* and the positions taken in the present case.  In *Mid-Continent*, both insurers admitted that their policies covered the underlying lawsuit.  Because each insurer's policy provided coverage, each policy's pro rata clause applied and obligated each coinsurer to pay a proportionate share of the insured's loss up to $1 million.  In addressing whether one insurer whose policy covered the claim could sue a coinsurer to seek reimbursement for paying a disproportionate or excessive part of the settlement fund, the *Mid-Continent* court relied heavily on the fact that the coinsurers' pro rata clauses made the two policies "several and independent of each other."  236 S.W.3d at 772.  Because the pro rata clauses operated "to ensure that each insurer is not liable for any greater proportion of the loss than the coverage amount in its policy bears to the entire amount of insurance coverage available," the *Mid-Continent* court held that "a direct claim for contribution between co-insurers disappears when the insurance policies contain 'other insurance' or 'pro rata' clauses."  *Id.*

24

Similarly, because the pro rata clauses served to "eliminat[e] the potential for double recovery by the insured," the *Mid-Continent* court determined that "a fully indemnified insured has no right to recover an additional pro rata portion of settlement from an insurer regardless of that insurer's contribution to the settlement.  Having fully recovered its loss, an insured has no contractual rights that a co-insurer may assert against another co-insurer in subrogation."  *Id.* at 775–56.

Mid-Continent made it clear that coinsurers whose policies both cover an underlying lawsuit, whose policies both contain "other insurance" or "pro rata" clauses, and who both contributed to settle an underlying lawsuit against an insured that fully indemnifies the insured, have no contractual or equitable subrogation obligations or contribution rights between them.  In this case, although the settlement fully indemnified the insured, both insurers deny coverage of the underlying lawsuit.  Chicago and Lexington each paid fifty percent of the amount needed to settle the underlying lawsuit under a nonwaiver agreement that allowed them to fund the settlement while continuing to deny coverage and reserving any available right to seek reimbursement from the other.  Both insurers dispute coverage.  "[A]n insurer that settles a claim against its insured when coverage is disputed may seek reimbursement from the insured should coverage later be determined not to exist."  *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 43 (Tex. 2008) (citation omitted).  In this case, an insurer that disputes coverage but settles an underlying suit with another insurer that also disputes coverage is seeking reimbursement from that other insurer.

The issue in this case is not whether an insurer contributing to settle an underlying suit, which its policy covered, may later sue to challenge the amount it paid and seek to recover the "excess" or "disproportionate" amount from another insurer that also contributed to the settlement.  Those issues were directly addressed in *Mid-Continent*.  The issue here is whether an insurer who contributes to settle an underlying suit, which it asserts its policy did *not* cover, may later sue another insurer who also contributed to the settlement, demanding reimbursement of the amount paid.  *Mid-Continent* does not address whether an insurer that contributes to a settlement fund but denies coverage for the underlying lawsuit, and that reserves the right to dispute coverage and seek reimbursement for the entire amount it paid, may recover that amount from the other insurer, particularly when that other insurer also denies coverage.

Whether this case presents facts that bring it within "the context presented" in *Mid-Continent* appears to depend on whether the Lexington and Chicago policies both provide coverage for the underlying lawsuit.  236 S.W.3d at 773.  The coverage issue must be addressed to resolve whether *Mid-Continent* precludes Lexington's reimbursement claim because Lexington and Chicago are coinsurers.  The coverage issues the parties raise are Chicago's claim that it received notice of the underlying suit too late and Lexington's claim that its policy did not cover the underlying lawsuit because it requires reformation or because it provides no coverage as written.  These issues are addressed below.

*1.     Coverage Under the Chicago Policy*

Chicago does not dispute that the wrongful act that gave rise to the underlying lawsuit

26

occurred during the Chicago policy's period.  Rather, Chicago argues that its policy "does not provide coverage for the underlying loss because of the insured's late notice."  (Docket Entry No. 54 at 4).

The Chicago policy requires the insured to "give written notice to the Company as soon as practicable of any claim made against the Insured or of any specific circumstances involving a particular person likely to result in a claim."  (Docket Entry No. 48, Ex. 4).  Citing several Texas cases, Chicago contends that "[i]t is well established in Texas that notice provisions requiring notice of an occurrence be given 'as soon as practicable' or 'promptly' are a condition precedent, a breach of which voids policy coverage."  (Docket Entry No. 54 at 7).  Chicago asserts that Staff Search's failure to provide timely notice of the underlying lawsuit prejudiced Chicago such that it "does not owe any duties of defense or indemnity."

Lexington responds that "Chicago does not deny that the incident in question occurred during the policy period of the Chicago policy."  (Docket Entry No. 59 at 3).  Lexington asserts that Chicago was not prejudiced by the timing of Staff Search's notice and points out that "Chicago does not comment in its response on the reasonableness of the settlement reached with the plaintiffs at the second mediation" or "suggest that the settlement would have been less had notice been provided to Chicago sooner."  (*Id.* at 4).  Citing *Coastal Refining & Marketing, Inc. v. U.S. Fidelity and Guaranty Co.*, 218 S.W.3d 279, 289 (Tex. App.—Houston [14th Dist.] 2007, pet. denied), Lexington contends that "an insurer must demonstrate that the alleged late notice caused the insurer 'actual' prejudice" and that

27

Chicago has failed to offer any evidence of actual prejudice.  (*Id.* at 5).

Texas courts have held that to deny coverage due to an insured's untimely notice, "an insurer must show it was prejudiced by the insured's failure to give the insurer notice of a claim."  *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 690 (Tex. App.—Houston [14th Dist.] 2006), pet. denied); *see also USAA County Mut. Ins. Co. v. Cook*, 241 S.W.3d 93, 102 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("[A]n insured's actions will not operate to discharge the insurer's obligations under the policy unless the insurer is actually prejudiced or deprived of a valid defense by the actions of the insured."); *Blanton v. Vesta Lloyds Ins. Co.*, 185 S.W.3d 607, 611 (Tex. App.—Dallas 2006, no pet.) ("The insured's failure to notify the insurer does not absolve the insurer from the underlying judgment unless the lack of notice prejudices the insurer.") (citations omitted).  An insurer "must demonstrate a material change in position to establish prejudice" and "may not disclaim coverage on the basis of prejudice that is only theoretical or presumed merely from the length of delay."  *Coastal Refining & Marketing*, 218 S.W.3d at 288.

Chicago does not raise a fact issue material to determining whether Staff Search's delayed notice defeated the coverage provided by the Chicago policy.  The Texas Supreme Court has held that "only a material breach of the timely notice provision will excuse [the insurer's] performance under the policy."  *PAJ, Inc. v. The Hanover Ins. Co.*, 243 S.W.3d 630, 632 (Tex. 2008).  "[A]n insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay."  *Id.* at 636–37.  In *PAJ*, the insured did not notify its insurer of the suit until "four to six months after litigation

commenced." *Id.* at 631. Because the insurer had "suffer[ed] no harm as a result" of the delay in notice, *id.*, the court held that "the insurer could not deny coverage because of untimely notice." *Id.* at 637.

The record does not contain evidence of actual prejudice to Chicago resulting from Staff Search's late notice of the underlying lawsuit. *See USAA County Mut. Ins. Co.*, 241 S.W.3d at 102 (rejecting the insurer's lack-of-notice defense because the insurer only alleged "in a conclusory sentence . . . that it was prejudiced by [the insured's] breach" and "there is no evidence in the record and [the insurer] provides no guidance to this Court as to how it detrimentally relied on any misrepresentations made by [the insured]"). The record does not support an inference that Chicago may have suffered prejudice rising to the level Texas courts require. *Compare Blanton*, 185 S.W.3d at 613 (finding that the insurer suffered prejudice due to the insured's delay in notifying the insurer of a covered occurrence for over two and a half years); *Harwell v. State Farm Mut. Auto Ins. Co.*, 896 S.W.2d 170, 174 (Tex. 1995) (holding that "[t]he failure to notify an insurer of a default judgment against its insured until after the judgment has become final and nonappealable prejudices the insurer as a matter of law"); *Filley v. Ohio Cas. Ins. Co.*, 805 S.W.2d 844, 847 (Tex. App.—Corpus Christi 1991, writ denied) (finding that the insurer suffered prejudice because it "did not become aware of the claim's existence until approximately three years from the date of the occurrence, at which time trial was rapidly approaching" and the insurer had to defend "without the benefit of having its insured assist in its defense by disclosing facts, names of witnesses, and otherwise assisting in case preparation"); *Kimble v. Aetna Cas. and Sur. Co.*,

767 S.W.2d 846, 851 (Tex. App.—Amarillo 1989, writ denied) (finding that the insurer

suffered prejudice because it did not receive notice of the suit against the insured until after

default judgment was entered against the insured) *with Lianetz v. St. Paul Guardian Ins. Co.*,

No. 03-07-CV-0123-BD, 2008 WL 2815561, at *3 (N.D. Tex. July 23, 2008) (finding that

the insurer's "speculative and conclusuory assertions"—that the insurer it could have assisted

its insured's defense "and then sought subrogation," could have "intervened to assist

plaintiffs in capturing a financial recovery," and could have "investigate[d] the solvency of

all parties involved in the claim"—"are insufficient to establish prejudice as a matter of

law"); *Lennar Corp.*, 200 S.W.3d at 690–91 (noting that the insurer "has presented no

evidence it was prejudiced by the lack of notice" and declining to presume prejudice as a

matter of law due to the insured's settling certain claims before notifying the insurer).

Chicago has failed to raise a fact issue as to whether it suffered actual prejudice due

to Staff Search's delay in providing notice.  There is no basis to find that the Chicago policy

did not cover the underlying lawsuit.

### 2. *Coverage Under the Lexington Policy*

Lexington argues that its policy provides no coverage for the underlying lawsuit as

a matter of law.  If the policy is enforced as written, Lexington argues that the wrongful act

did not occur within the "policy period" as Endorsement 4 requires, and that Exclusion o

excludes coverage for coverage for wrongful acts "covered under any policy in effect before

this policy."  (Docket Entry No. 47, Ex. 2-C).  Lexington contends that under Exclusion o,

the Chicago policy was "in effect" before the Lexington policy.  Alternatively, Lexington

argues that the policy should be reformed to correct mistakes in drafting by providing a retroactive date of April 17, 2004 for professional medical liability claims. The policy would not provide coverage because the underlying act occurred on January 7, 2004, before the policy's reformed retroactive date.

Lexington's arguments are addressed separately below.

### a.      *Enforcing the Lexington Policy as Written*

Lexington argues that coverage does not exist under its policy if this court enforces Endorsement 4 as written. Lexington contends that Endorsement 4 does not provide coverage for the underlying suit because the underlying "wrongful act" did not occur within the "policy period" as required by that endorsement. Lexington relies on the definition of "policy period" in the Declarations page. Endorsement 4 has an effective date of April 17, 2005 and states as follows:

> In consideration of the premium charged, it is hereby understood and agreed that Section I, WHAT THIS AGREEMENT COVERS, is amended to read as follows:
>
> Professional Liability
>
> We'll pay you amounts you are legally obligated to pay to compensate others for loss resulting from your wrongful act or that of another for whom you are legally responsible. The wrongful act must first take place during the policy period and solely in the conduct of your business as a healthcare agency and or temporary help service agency.
>
> For purposes of this endorsement, temporary help service agency means an agency, supplying for a fee, clerical staff to a client of the agency.

All other terms, conditions, and exclusions remain the same.

(Docket Entry No. 47, Ex. 2-C).  The Lexington policy defines the "policy period" as "the period commencing on the effective date shown in the Declarations."  (*Id*., Ex. 2-C).  The policy's Declarations page states as follows:

> Item 2. (a) POLICY PERIOD:
>
> From: April 17, 2005          To: April 17, 2006
>
> 12:01 A.M., Standard Time, at the address stated in Item
>
> 1.

(*Id.*, Ex. 2-C).  Lexington argues that because the wrongful act did not occur between April 17, 2005 and April 17, 2006, there is no coverage for the underlying lawsuit.  Citing *INA of Texas v. Leonard*, 714 S.W.2d 414, 416 (Tex. App.—San Antonio 1986, writ ref'd n.r.e), Lexington argues that although this interpretation of Endorsement 4 clearly conflicts with other provisions in the policy's Declarations page and with Endorsement 2, Endorsement 4 controls because it was issued last in time.  (Docket Entry No. 59 at 8).

Both the policy's Declarations page and Endorsement 2 provide an April 17, 2001 retroactive date.  Lexington's interpretation of "policy period" in Endorsement 4 to ignore any retroactive date is inconsistent with these other policy provisions.  Lexington's interpretation is also inconsistent with its own acknowledgment that it intended to provide coverage for medical professional liability arising from acts occurring between April 2004 to April 2006 (although Lexington separately contends that it also intended to require the insured to provide notice of the claim within the policy period of April 2005 to April 2006).

32

Chicago argues that interpreting Endorsement 4 to limit medical professional liability coverage to events occurring between April 2005 to April 2006 "materially alters the policy that was originally issued" and that Lexington acknowledges that it intended to issue. Chicago argues that Lexington points to "no evidence that Jim Iden [Staff Search's president] or Staff Search[] agreed to or affirmed such a modification." (Docket Entry No. 54 at 11).

Lexington does not show that as a matter of law, applying Endorsement 4 as written excludes coverage for the underlying lawsuit. In oral argument, Lexington acknowledged that this interpretation of Endorsement 4 vitiates the contracting parties' intention to provide coverage for medical professional liability to a retroactive date, not to the date that begins the defined "policy period." Staff Search negotiated and paid a premium to avoid gaps in its coverage for both medical professional liability and nonmedical staffing errors and omissions. Correspondence between Staff Search and its insurance broker shows that the parties agreed that the policy would include a retroactive date for coverage. The policy's Declarations page sets out a retroactive date of April 17, 2001. Lexington admits that it intended to provide a retroactive date to at least April 2004 for medical liability claims and to April 2001 for nonmedical error and omission claims. To enforce Endorsement 4 as Lexington interprets it would contravene the parties' clear intentions, reduce the scope of Staff Search's insurance coverage under the Lexington policy, and make not only Endorsement 2 but also key provisions in the policy's Declarations page meaningless. It is at least as reasonable, and more plausible, to interpret Endorsement 4 as written to refer to the "policy period" determined not only by the original effective dates stated on the

33

Declarations page but also by the applicable retroactive dates stated on that page and in other Endorsements.  Lexington's proffered interpretation is not a reasonable, and certainly not the only reasonable, interpretation of Endorsement 4.  Endorsement 4 is at a minimum ambiguous and must be construed in favor of coverage.  *Fiess*, 202 S.W.3d at 746. Lexington has not shown that as a matter of law Endorsement 4 as written precludes coverage for the underlying lawsuit.

Lexington also argues that Exclusion o as written excludes coverage for wrongful acts "covered under any policy in effect before this policy."  (Docket Entry No. 47, Ex. 2-C). Lexington again relies on the language defining the "policy period" as the "period commencing on the effective date shown in the Declarations."  (*Id.*, Ex. 2-C).  Lexington argues that because the Chicago policy period—April 17, 2003 to April 17, 2004—predates the Lexington policy period—April 17, 2005 to April 17, 2006—the Chicago policy was "in effect" before the Lexington policy and provided coverage for the wrongful act, excluding coverage under the Lexington policy.  Chicago points out that the language of Exclusion o is ambiguous because it is open to an alternative interpretation.  Chicago argues that "[b]y application of the retroactive date of April 17, 2001 [specified in the policy's declarations], the Lexington Policy was '*in effect*' from April 17, 2001 to April 17, 2006."  (Docket Entry No. 54 at 13).  Because the Chicago policy was effective from April 17, 2003 to April 17, 2004, Chicago argues that its policy was "in effect" *after* the Lexington policy.  Chicago contends that the Exclusion o language is ambiguous because it is open to both interpretations offered by the parties and must be construed against the drafter, Lexington,

34

and in favor of coverage.

In excluding coverage for "any wrongful act covered by any policy in effect *before this policy*," (Docket Entry No. 47, Ex. 2-C, emphasis added), Exclusion o is "susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut. Ins. Co. v. Shaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Exclusion o does not define the term "before this policy." The words used leave it unclear whether Exclusion o excludes coverage for wrongful acts occurring before the "policy period" or before the retroactive coverage date. An ambiguous insurance policy should be construed "strictly against the insurer and liberally in favor of the insured." *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). This court cannot find that as a matter of law, Exclusion o as written applies to exclude coverage of the underlying lawsuit.

Neither Exclusion 4 nor Exclusion o, as written, support Lexington's argument that as a matter of law its policy did not cover the underlying suit. Unless the Lexington policy is reformed, as Lexington argues, *Mid-Continent* applies to preclude Lexington's reimbursement claim because both Lexington and Chicago issued policies that covered the underlying suit.

### b.    *Lexington's Reformation Argument*

Lexington seeks reformation of its policy in its motion for partial summary judgment against Staff Search and Meadows. Citing correspondence among Stephen Stewart, Staff Search's insurance broker; Kerry Anderson, a broker for Lexington; and Jim Iden, Staff Search's president, Lexington argues that the parties agreed that "Lexington would issue a

single claims made policy to Staff Search covering medical professional liability and non-medical staffing errors and omissions for the policy period April 17, 2005 to April 17, 2006, with limits of $1 million for each wrongful act or series of continuous or related acts." (Docket Entry No. 47 at 5).  Lexington further contends that the parties agreed "that the retroactive date for medical professional liability would be April 17, 2004 and the retroactive date for non-medical staffing errors and omissions would be April 17, 2001."  (*Id.* at 5–6). Lexington asserts that Endorsements 2 and 4 "contain drafting errors and do not reflect" the parties' original agreement.  (Docket Entry No. 47 at 10).  Lexington argues that Endorsement 2 "was added to provide a retroactive date of April 17, 2001 for non-medical staffing errors and omissions."  (*Id.* at 8).  Because of Lexington's admitted drafting error, Endorsement 2 provided a retroactive date of April 17, 2004 for medical professional liability claims "for any services that would have been covered under the prior Interstate policy #ASC-10000U."  (*Id.*, Ex. 2-C).  Lexington argues that Endorsement 4 "was added to expand the coverage under the form policy to include non-medical staffing errors and omissions." (*Id.* at 8).  Because of Lexington's admitted drafting error, Endorsement 4 states that Lexington will provide coverage for any wrongful act that "take[s] place during the policy period."  (*Id.*, Ex. 2-C).

Chicago adopts the arguments that Staff Search and Meadows make as to why the Lexington policy should not be reformed.  Chicago points out that Lexington "never even made a 'mutual mistake' reformation argument until November 13, 2006, with its first amended complaint, after the underlying lawsuit was settled."  (Docket Entry No. 54 at 8).

36

In their response to Lexington's motion for partial summary judgment, Staff Search and Meadows argue that Lexington has failed to show a mutual mistake warranting reformation of the insurance contract, noting that Lexington points to no evidence of Jim Iden's intent when he negotiated the terms of the Lexington policy on Staff Search's behalf. Staff Search and Meadows maintain that "[w]hen Staff Search purchased insurance coverage, it intended to purchase the maximum amount of coverage it could secure at the least amount of cost," (Docket Entry No. 53 at 4), such that "[i]f there was overlapping coverage with other policies, it would have been to Staff Search's benefit," (*id.* at 5). Citing an affidavit from Stephen Stewart in which he states that "the agreement between Staff Search and Lexington is reflected in the insurance binder," (*id.*, Ex. 4 at 1), Staff Search and Meadows point out that the binder memorializing the parties' agreement provided a retroactive date of April 17, 2001 for *all* claims, including medical professional liability claims of the sort forming the basis of the underlying suit. Staff Search and Meadows contend that "Lexington's motion, at best, establishes a unilateral mistake" and that such a "'mistake' by the insurer in the scope of coverage issued which was not raised until over a year *after* the issuance of the policy is *not* a *mutual* mistake under Texas law which permits the remedy of reformation." (*Id.* at 8).

Reformation of a contract requires two elements: (1) an original agreement; and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) (citations omitted). "One seeking reformation of a written instrument must prove that the erroneously written, included, or omitted provision in the instrument was there or was omitted by mutual

37

mistake."  *U.S. Fire Ins. Co. v. Scottsdale Ins. Co.*, --- S.W.3d ----, 2008 WL 62561, at *8 (Tex. App.—Dallas Jan. 7, 2008, no pet.) (quoting *Huttleston v. Beacon Nat'l Ins. Co.*, 822 S.W.2d 741, 746 (Tex. App.—Fort Worth 1992, writ denied)).  Proof of the opposing party's prior agreement to an omitted term is an essential element of the equitable remedy of reformation.  *Id.* (citing *Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 382 (Tex. 1966)).  "One is presumed to intend what he does or undertakes to do by the terms of a written instrument voluntarily signed by him."  *Champlin Oil*, 403 S.W.3d at 382 ("We are therefore required to start with the presumption that [the defendant] intended to contract [as the contract's language indicates].").

To support its reformation claim, Lexington relies on correspondence between Jim Iden, Staff Search's president, and Stephen Stewart, Staff Search's insurance broker, who both negotiated on behalf of Staff Search during the Lexington policy's underwriting process.  Stewart informed Iden in several letters that the Lexington policy was a claims-made policy with a "split" retroactive date, one for medical professional liability and one for nonmedical staffing errors and omissions.  Lexington also submits affidavits from Stewart and Kerry Anderson, Lexington's policy underwriter, confirming that they shared this understanding.

Stephen Stewart's affidavit contains contradictory statements.  Although Stewart states that the Lexington policy would have a retroactive date of April 17, 2001 for nonmedical claims and a retroactive date of April 17, 2004 for medical professional liability claims, he also states that "[t]he Agreement between Staff Search and Lexington is reflected

38

in the insurance binder . . . that I sent to Jim Iden, President of Staff Search." (Docket Entry No. 47, Ex. 1 at 4; Docket Entry No. 53, Ex. 4 at 1). The binder provides only a retroactive date of April 17, 2001 for *all* claims. (Docket Entry No. 53, Ex. 4 at 3). In addition, Lexington fails to address, and the evidence Lexington provides fails to explain, why Endorsement 2, which Lexington asserts was intended to provide an April 17, 2004 retroactive date for *all* medical professional liability claims, effectuated this intent by identifying only claims that were also covered under a policy issued by another insurer, Interstate. Nor does the evidence explain why Endorsement 4, which Lexington asserts was intended to expand coverage to include nonmedical staffing errors and omissions, contains a header only for "Professional Liability," states that the "wrongful act must first take place during the policy period," and omits the "claims-made" language of the original agreement that required a claim to be brought during the policy period.

Staff Search and Meadows argue that there was no mutual mistake and that Lexington has failed to offer any evidence as to Iden's intent when he negotiated and accepted the terms of the Lexington policy. Staff Search and Meadows submit an affidavit from Iden stating that he "intended to purchase the maximum amount of coverage it could secure at the last amount of cost" and that "[i]f there was overlapping coverage between policies, it would be a benefit to Staff Search." (Docket Entry No. 53, Ex. 1). Iden also points out in his affidavit that Staff Search paid a premium based on an April 17, 2001 retroactive date for all claims, as stated in the binder, and has not been reimbursed any premium amount based on a

39

purported April 17, 2004 retroactive date for medical professional liability.[2]

The record contains conflicting evidence as to Staff Search's intent in negotiating the policy and as to the parties' agreement.  Lexington has failed to show that its  policy should be reformed to exclude coverage.  Lexington's motion for partial summary judgment against Staff Search and Meadows is denied.

### 3.    The Application of Mid-Continent

Neither Chicago nor Lexington has shown that as a matter of law, its policy does not provide coverage for the underlying lawsuit.  The *Mid-Continent* court's analysis of the rights that one settling insurer may assert against a jointly settling insurer whose policies

---

[2]       Lexington objects to paragraphs 6, 7 and 10 in Iden's affidavit.  In paragraph 6, Iden states, "Lexington now seeks to avoid coverage by reforming the policy based on numerous mistakes they claim they made in the underwriting process."  (Docket Entry No. 53, Ex. 1, ¶ 6).  Lexington argues that this statement is conclusory and misstates its position.  Lexington contends that the record "establishes that the Lexington Policy did not accurately reflect the agreement between the parties due to a mutual mistake."  (Docket Entry No. 58 at 3).  To the extent that Lexington seeks to reform the policy and asserts that the policy does not cover the underlying lawsuit, Iden's statements are not misleading.  Lexington's objection is overruled.

In paragraph 7, Iden states, "When I purchased coverage for Staff Search, I intended to purchase the maximum amount of coverage it could secure for the least amount of cost."  (Docket Entry No. 53, Ex. 1, ¶ 7).  Lexington argues that this statement is conclusory and irrelevant.  A mutual mistake exists when evidence shows that both parties acted under the same misunderstanding of a material fact.  *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990) ("The parol evidence rule does not bar extrinsic proof of mutual mistake." (citing *Santos v. Mid-Continent Refrigerator Co.*, 471 S.W.2d 568, 569 (Tex. 1971))).  Iden's intent when negotiating the terms of the policy is relevant to the content of the parties' agreement.  Lexington's objection is overruled.

In paragraph 10, Iden states that the binder he received "reflected a premium that included an April 17, 2001 retro date.  To date, Staff Search never received any refund of premium it paid for the coverage reflected in the binder.  Instead, Staff Search was served with this lawsuit and forced to incur attorney's fees."  (Docket Entry No. 53, ¶ 10).  Lexington objects to these statements as speculative and argumentative and argues that Iden "fails to show any foundation for unsubstantiated assertions."  (Docket Entry No. 58 at 4).  Lexington does not dispute that the binder provided a single retroactive date for coverage for all claims, both medical professional and nonmedical errors and omissions.  As a party involved in the policy negotiations during the underwriting process, Iden has personal knowledge of the parties' agreement and the premium charged by Lexington.  Lexington's objection is overruled.

cover the underlying lawsuit applies to this case.

Lexington attempts to distinguish *Mid-Continent* on the ground that the insurers in that case had no contractual obligations between them.  Lexington argues that in contrast, "Lexington and Chicago entered into a non-waiver agreement" that "created a separate contractual right of reimbursement between the insurers in the event that this Court determines that there was no-coverage under the Lexington policy."  (Docket Entry No. 68 at 6).  This argument is not persuasive.  By its terms, the nonwaiver agreement does not create an independent contractual obligation between Lexington and Chicago for reimbursement.[3]  The agreement does not create independent rights between Lexington and Chicago, but instead only reserves any rights the parties already had under their policies and applicable law.

---

[3]The nonwaiver agreement states as follows:

> 3.06 . . . By agreeing to share in the temporary funding of any settlement that might be negotiated, the Parties do not waive, and expressly reserve, any and all of the terms, conditions, exclusions, and other provisions of their respective policies, as well as any defense under applicable law.  Each Party specifically reserves the right to seek reimbursement from any other Party of any amount advanced to temporarily fund any settlement.

> 3.07 The parties agree that any determination of the Parties' right to reimbursement shall be determined in the Coverage Lawsuit or, if necessary, in a separate action filed in the United States District Court for the Southern District of Texas, Houston Division.  Nothing in this Agreement precludes the right of any Party to appeal any determination by the District Court.
> . . .
> 3.09 By entering into this Agreement and performing as contemplated, the Parties do not waive, and expressly reserve, any and all rights under their respective Policies and applicable law.

(Docket Entry No. 62, Ex. 9).

As the *Mid-Continent* court explained, a direct claim for contribution between two insurers who pay to settle a lawsuit against a common insured "disappears when the insurance policies contain 'other insurance' or 'pro rata' clauses." 236 S.W.3d at 772 (citing *Hicks Rubber*, 169 S.W.2d at 148).   Such clauses make the contracts "several and independent of each other" and "preclude[] an equitable contribution claim" because each insurer has contractually agreed with the insured to pay only its share of a covered loss; "the co-insurers did not contractually agree to pay each other's pro rata share."  *Id.* at 772–73. To the extent that a coinsurer pays more than its contractually agreed upon proportionate share, that coinsurer does so "voluntarily; that is, without a legal obligation to do so."  *Id.* at 772.  Such an insurer cannot recover what it paid above its proportionate share from its coinsurers.  *See id.*

Lexington points out that the parties' nonwaiver agreement states that "by entering into this Agreement and performing as contemplated, neither of the Parties is acting as a volunteer."  (Docket Entry No. 62, Ex. 9).  Although the nonwaiver agreement labels the settlement as "nonvoluntary," this does not allow the parties to escape the *Mid-Continent* holding that insurers whose policies contain "other insurance" or "pro rata" clauses have no contractual or equitable obligations between them.  Both the Lexington and Chicago policies contain "other insurance" clauses that make the policies "several and independent of each other." 236 S.W.3d at 772.  Under *Mid-Continent* and *Hicks Rubber*, no equitable claim for contribution exists between Lexington and Chicago.  *See id.*; *see also Hicks Rubber*, 169 S.W.2d at 147 (noting that the two insurers' policies "contained the 'Other Insurance' clause,

42

sometimes referred to as the 'pro rata' insurance clause," such that the liability between the insurers is "several and not joint" and "each insurer shall not be liable for any greater proportion of loss which may occur than the amount named in the policy bears to the entire amount of the insurance coverage").  In *Mid-Continent*, the court noted that the insurers had "no contractual right of contribution between them" and declined "to create such an obligation under the common law."  *Id.* at 773.  Because Chicago and Lexington have no contractual right to contribution between them, and because the *Mid-Continent* court found that no right to contribution exists between insurers who jointly settle an underlying lawsuit based on their independent policies with a common insured, Lexington cannot recover on a contribution claim against Chicago.

Lexington has no right of subrogation against Chicago because Staff Search, the insured, was fully indemnified in the underlying lawsuit.  *Mid-Continent* reaffirms the principle that when asserting a right to contractual or equitable subrogation, "the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured."  *Mid-Continent*, 236 S.W.3d at 774.  Because Staff Search was fully indemnified in the underlying lawsuit, it has no cause of action to assert against Chicago.  Otherwise, such a cause of action would allow Staff Search an opportunity for double recovery.  *See Mid-Continent*, 236 S.W.3d at 775 ("An insured's right of indemnity under an insurance policy is limited to the actual amount of loss.");  *see also Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal. Rptr. 2d 296, 305 (1998) (cited by *Mid-Continent* for the principle that "[t]he fact that several

43

insurance policies may cover the same risk does not increase the insured's right to recover for the loss, or give the insured the right to recover more than once").  Because Lexington must step into Staff Search's shoes to assert only those rights held by Staff Search against Chicago, *see Mid-Continent*, 236 S.W.3d at 775, Lexington has no subrogation rights, contractual or equitable, to assert against Chicago.

In summary, under *Mid-Continent*, Lexington has no right to contribution or subrogation that it can assert against Chicago to recover the amounts that Lexington paid to settle the underlying lawsuit or to defend that suit after the defense was tendered to Chicago.

## IV.   Conclusion

Chicago's summary judgment motion against Lexington is granted.  Lexington's summary judgment motion against Chicago is denied.  Lexington's motion for partial summary judgment against Staff Search and Meadows to reform the Lexington policy is denied.  By **August 25, 2008**, the parties are directed to identify any remaining issues and propose a schedule for resolving them or, if no issues remain, to submit a proposed final judgment.

SIGNED on August 8, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge